IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ELISSA M. WRIGHT,

                    Plaintiff,                          CV-08-6161-ST

        v.                                   FINDINGS AND
                                                   RECOMMENDATION

MICHAEL J. ASTRUE, Commissioner, Social
Security Administration,

                        Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Elissa M. Wright (Wright"), seeks judicial review of the Social Security

Commissioner's final decision denying her application for Disability Insurance Benefits ("DIB")

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act

("Act"), 42 USC §§ 401-33, 1381-83f. This court has jurisdiction under 42 USC §§ 405(g) and

421(d). For the reasons that follow the Commissioner's decision should be reversed and the case

remanded for an immediate award of benefits.

1 - FINDINGS AND RECOMMENDATION

## ADMINISTRATIVE HISTORY

Wright applied for DIB and filed a protective application for SSI on October 20, 2006, alleging disability beginning December 31, 2005.  Tr. 93-100.  Her applications were denied initially and on reconsideration.  Tr. 63-79.  A hearing was held before administrative law judge ("ALJ") Gary Elliott on October 16, 2007.  Tr. 28-57.  The ALJ issued a decision on January 22, 2008, finding Wright not disabled.  Tr. 8-22.  The Appeals Counsel denied Wright's request for review, making the ALJ's decision the Commissioner's final decision.  Tr. 2-5; 20 CFR §§ 404.981, 416.1481, 422.210; *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).

## BACKGROUND

Wright was born in 1980, and was 27 years old at the time of the hearing before the ALJ.  Tr. 32, 93.  She has a seventh grade education and past relevant work as a dining room attendant and a housekeeper.  Tr. 51-52, 109, 121.  She alleges that she is unable to work due to fibromyalgia, hepatitis C, an anxiety disorder, post-traumatic stress syndrome ("PTSD"), learning disabilities, a pelvic floor disorder, asthma, hypoglycemia, non-typical seizures, chronic pain, and alcoholism.  Tr. 109.  Wright is eligible for DIB until December 31, 2010.  Tr. 10, 101.

Despite her relatively young age, Wright has accumulated a prodigious medical record.  Between January 2004 and November 2007, Wright presented to a hospital emergency room or urgent care clinic complaining of acute illness no less than 36 times.  She has been seen by a multitude of physicians and mental health professionals for a litany of maladies and symptoms.  Featured most frequently in the record are her complaints of pelvic and abdominal pain, fibromyalgia, neck and leg pain, and anxiety and PTSD.  *See, e.g.*, Tr. 289-90 (fibromyalgia and knee pain), 401-402 (pelvic and abdominal pain), 598-606 (abdominal pain), 593-93 (psychiatric

disorder and anxiety), 575-83 (pelvic pain and vaginal discharge), 345 (dysmenorrhea (severe

pain during menstruation) and dyspareunia (severe pain during sexual intercourse)), 478-79

(abdominal pain and dysmenorrhea), 469-70 (abdominal pain, dysmenorrhea, menorrhagia

(abnormally heavy, long menstruation), and chronic pelvic pain), 449 (abdominal pain and

dyspareunia), 321-22 (anxiety and PTSD), 353 (chronic pelvic pain and pelvic floor

dysfunction), 330 (knee pain), 356-57 (neck pain).

Wright's medical issues extend back to her childhood.  Wright has told multiple care

providers that her mother and step-father abused her, including performing Satanic rituals on her,

which led her to run away at age 13.  Tr. 313-14, 321-22.  Her mother also allegedly abused her

by intentionally making her sick (known as Munchausens-by-Proxy).  Tr. 152.  At age 14, she

was kidnaped by a man who threatened to kill her, but who was caught and convicted based on

her testimony.  *Id*.  A year later, she alleges she was brutally raped while living on the street, but

to avoid engaging the criminal justice system, never reported it or went to the hospital.  Tr. 218-

19.  Wright has remained homeless off and on and has lived at times with her grandmother,

sister, and friends.  Tr. 45, 136-37.  She has a history of drug and alcohol abuse but had been

clean for several years prior to a relapse in January 2004.  Tr. 271, 321.  At that time she moved

from Eugene to Bend to undergo residential treatment and has been clean since that time.  *Id*.

She returned to Eugene sometime in mid-2006.  Tr. 390.

Wright claims she was diagnosed with fibromyalgia in 1999 and has suffered

unpredictable but frequent "flare-ups" of her pain ever since.  Tr. 282-83, 289.  Her treatment

records for pelvic floor disorder are extensive.  Tr. 344-54.  Despite this record and multiple x-

rays, computed tomography ("CT") scans, and ultrasounds, the etiology of her pain is not

altogether clear, although she has been diagnosed with ovarian cysts (Tr. 575-83), dysmenorrhea (Tr. 345-47, 469-70, 478-89, 481-82), several urinary tract infections (Tr. 431, 668-77), kidney infections (pyelonephritis) (Tr. 253-57, 668-77), a pelvic floor disorder (also referred to as pelvic floor dysfunction) (Tr. 351), and chronic pelvic pain (Tr. 353, 645-47).

Wright claims she has suffered from severe anxiety and PTSD since her victimization by her step-father which was compounded by her kidnaping and rape.  Tr. 152, 215-220.  Her treatment records for these mental impairments are much less extensive.  She received counseling and prescription drugs for a period of approximately one year from Deschutes County Mental Health, although she missed more treatment sessions then she attended. Tr. 300-26.

In July 2005, she suffered an on-the-job injury to her neck, resulting in pain in her neck and left shoulder.  Tr. 342, 332-35, 359, 406-19.  She was eventually released back to work (Tr. 636), but maintains that she still suffers neck and shoulder pain and claims that she remains under a permanent 20-pound weight restriction and a restriction from any overhead lifting.  Tr. 154.  Wright was terminated from this job later in 2005.  Tr. 353.

After returning to Eugene in 2006, Wright had three unsuccessful work attempts of short duration.  Tr. 143-44.  In each instance, she claims she was unable to work or was terminated because of her medical condition.  *Id*; *see also*, Tr. 35-36, 123-25.

Wright is a chronic user of multiple medications including Effexor for anxiety and depression, Trazadone to help her sleep, the muscle relaxer Flexeril, and pain medications such as Vicoden, Ultram, and Ibuprofen.  *See*, *e.g.*, Tr. 263-65, 258-62, 280-81, 330, 351, 353, 357, 360, 362, 366-67.

4 - FINDINGS AND RECOMMENDATION

## DISABILITY ANALYSIS AND ALJ'S FINDINGS

The burden in on the claimant to prove that she is disabled within the meaning of the Social Security Act.  *See Tackett v. Apfel*, 180 F3d 1094, 1098 (9th Cir 1999).  Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 USC § 423(d)(1)(A).  An individual is disabled only if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  42 USC § 423(d)(2)(A).  An applicant for DIB has the burden of showing disability prior to the expiration of her insured status.  *Johnson v. Shalala*, 60 F3d 1428, 1432 (9th Cir 1995).

The Commissioner has developed a five-step sequential evaluation process for determining whether a claimant possesses a disability as defined above.  *See* 20 CFR §§ 404.1520, 416.920; *see also Tackett*, 180 F3d at 1098-99 (describing the sequential evaluation process).  The claimant bears the burden of proof at steps one through four.  *Tackett*, 180 F3d at 1098-99.  At step five, the burden shifts to the Commissioner to identify jobs existing in significant numbers in the national economy that the claimant can perform given her residual functional capacity ("RFC"), age, education, and work experience.  *Id.*; 20 CFR §§ 404.1560(c)(2), 416.960(c)(2).

Applying this analysis, the ALJ concluded at step one that Wright had not engaged in substantial gainful activity since December 31, 2005, the alleged onset date. Tr. 12; *see* 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

At step two, the ALJ found that Wright had the severe impairments of degenerative disc disease of the cervical spine, fibromyalgia, and hepatitis C. Tr. 14; *see* 20 CFR §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c).

At step three, the ALJ found that Wright did not have an impairment or combination of impairments that met or equaled any of the impairments in the Listings of Impairments, 20 CFR Part 404, Subpt P, App 1. *See* 20 CFR §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d). Next the ALJ determined Wright's RFC as follows:

> the claimant has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; she can sit, stand, or walk, each, up to six hours in an eight hour workday; she is limited to occasional crawling and no overhead reaching; she should avoid concentrated exposure to heights or moving machinery; and there should be no climbing of ladders, ropes, [or] scaffolds.

Tr. 15; *See* 20 CFR §§ 404.1520(e), 404.1545, 416.920(e), 416.945.

At step four, the ALJ concluded, based on the testimony of a vocational expert ("VE"), that Wright was unable to perform any past relevant work. Tr. 20; *see* 20 CFR §§ 404.1520(a)(4)(iv), (f), 416.920(a)(4)(iv), (f).

At step five, the ALJ concluded, also based on the testimony of the VE, that Wright was not disabled because she could perform other work existing in significant numbers in the national economy such as a ticket seller, an assembler of small parts, and an office helper. Tr. 21-22; *see*, 20 CFR §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g).

**STANDARD OF REVIEW**

District courts have the power to affirm, modify, or reverse the decision of the Commissioner, with or without remanding the case. 42 USC § 405(g). The Commissioner's decision must be affirmed if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 USC § 405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F3d at 1039 (citation omitted). The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Id*; *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986) (citations omitted). If based on the proper legal standards and supported by substantial evidence, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F3d at 1039-40 (citation omitted).

**FINDINGS**

**I.    Allegations of Error**

Wright challenges the ALJ's decision at steps two and five of the sequential disability analysis. At step two, she argues the ALJ erred by excluding her pelvic floor dysfunction, dysmenorrhea, and menorrhagia as severe impairments. The ALJ was able to do so, she contends, only by improperly rejecting the opinions of treating and examining physicians and her testimony about the limiting effects of her pain and other symptoms. At step five, she argues the ALJ erred by relying on the testimony of a VE that was based on an incorrect RFC.

///

7 - FINDINGS AND RECOMMENDATION

## II.    <u>Step Two</u>

At step two of the sequential disability analysis, the ALJ is required to "consider the medical severity of [a claimant's] impairment(s)."  20 CFR §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment is not severe "if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."  20 CFR §§ 404.1521(a), 416.921(a).  Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "[c]apacities for seeing, hearing, and speaking;" and "[u]nderstanding, carrying out, and remembering simple instructions."  20 CFR §§ 404.1521(b)(1)-(3), 416.921(b)(1)-(3).  "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work."  *Smolen v. Chater*, 80 F3d 1273, 1290 (9th Cir 1996), quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, *3 (Nov. 30, 1984).  Step two serves as a "*de minimis* screening device to dispose of groundless claims."  *Smolen*, 80 F3d at 1290 (italics added), citing *Bowen v. Yuckert*, 482 US 137, 153-54 (1987).

Based on these standards, the ALJ erred in failing to find that Wright's pelvic floor dysfunction was a severe impairment.  Wright went to an emergency room or urgent care clinic complaining of pelvic or abdominal pain at least 21 times over a period of three-and-a-half years.  Her treating gynecologist from January 2005 to early 2006, John Murphy, MD, diagnosed her with pelvic floor disorder and treated her multiple times for chronic pelvic pain, dysmenorrhea, dyspareunia, menorrhagia, and dyschezia.  Tr. 345-54.  This diagnosis was based on multiple physical examinations and a diagnostic laperoscopy and hysteroscopy which were negative for endometriosis.  Tr. 471, 351, 353.

Wright also proffers the opinions of Gary P. Young, MD, and Jim F. Newhall, MD. Dr. Young was an emergency room physician who saw Wright in May 2007 for lower abdominal pain. Tr. 645. She reported that she had been experiencing this pain for 10 to 12 years and that it was bad enough at times to make her vomit. After reviewing her medical history and examining her, Dr. Young diagnosed "[a]cute exacerbation of chronic pelvic pain" and prescribed Flexeril and Percocet to be taken as needed. Tr. 647.

Dr. Newhall treated Wright from November 2006 through 2007. Tr. 292-99, 648-56. In November 2006 she complained of a flare-up of her fibromyalgia causing a stiffening in her right upper extremities. Tr. 298. She reported that she had been diagnosed with fibromyalgia in 1997. The recent flare-up had lasted three days and was seven on a 1/10 pain scale. She also believed she had a pelvic infection. After a physical exam, he assessed her with fibromyalgia, by history. He prescribed a limited amount of medication and advised that the clinic did not have the ability to care for fibromyalgia. Nevertheless, Dr. Newhall continued to treat Wright for her abdominal and pelvic pain complaints throughout 2007, and, despite expressing some concern about her potential drug-seeking behavior on one occasion, he continued to prescribe her pain medication and antidepressants. Tr. 293-295, 650-53. Although he never diagnosed Wright with pelvic floor disorder, he did assess her with chronic pain and fibromyalgia, by history. Tr. 654

Wright argues that the ALJ was required to give these treating and examining physicians substantial weight and could not reject their medical opinions concerning her pelvic floor dysfunction and pelvic pain without providing clear and convincing reasons supported by substantial evidence in the record. *See Lester v. Chater*, 81 F3d 821, 830-31 (9th Cir 1995) (explaining weight to be given the opinions of treating and examining physicians). The ALJ

rejected the opinion of these physicians in favor of the opinion of Gary Halvorson, MD, another emergency room physician who treated Wright in October 2007 for acute pelvic pain but "could find no diagnosis to explain" her pain after conducting a pelvic ultrasound.  Tr. 665.

The assessment by Dr. Halvorson is equivocal at best.  Even if accepted, neither it nor any other treating or examining physician contradicts Dr. Murphy's diagnosis of pelvic floor dysfunction which is supported by substantial evidence in the record.  Thus, the ALJ erred by failing to include Wright's pelvic floor dysfunction as a severe impairment.[1]  *See Orn v. Astrue*, 495 F3d 625, 631 (9th Cir 2007) (treating physician's opinion must be given controlling weight if it is well-supported and not inconsistent with the other substantial evidence in the record), citing 20 CFR §§ 404.1527(d)(2).  Indeed, at step two, the ALJ did not even mention the treatment and diagnosis by Dr. Murphy or Wright's frequent trips to the emergency room for treatment of acute lower abdominal and pelvic pain.

Nevertheless, the ALJ found in favor of Wright at step two, permitting her claim to go forward to further steps of the sequential disability analysis.  Thus, any error in failing to consider certain impairments as severe did not prejudice Wright's claim at this level.  *See Burch v. Barnhart*, 400 F3d 676, 682 (9th Cir 2005) (any error in omitting an impairment from the severe impairments identified at step two was harmless where step two was resolved in claimant's favor); *Lewis v. Astrue*, 498 F3d at 911 (failure to list an impairment as severe at step two was harmless error where ALJ considered the functional limitations posed by that

---

[1] From Dr. Murphy's treatment notes, it appears that the other conditions Wright identifies, including dysmenorrhea, menorrhagia, dyschezia, and chronic pelvic pain, are symptoms or products of her pelvic floor dysfunction.

impairment later in the decision).  The court should not reverse the Commissioner's decision for harmless error.

The remainder of Wrights arguments challenging the ALJ's step-two analysis are misplaced and will be construed as challenges to her RFC, discussed below.

## III.    Step Five

At step five, having concluded that the claimant is unable to return to past relevant work, the burden switches to the Commissioner to prove that the claimant can "engage in any other kind of substantial gainful work which exists in the national economy[.]"  42 USC § 423(d)(2)(A); *see also* 20 CFR §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g).  In making a step-five finding, which includes non-exertional limitations, the ALJ is required to propound a hypothetical to a vocational expert.  *Osenbrock v. Apfel*, 240 F3d 1157, 1162 (9th Cir 2001); *Tackett*, 180 F3d at 1101-02.  This hypothetical must be "based on medical assumptions supported by substantial evidence in the record that reflects all the claimant's limitations." *Osenbrock*, 240 F3d at 1165 (citation omitted).

Wright argues that the ALJ erred at step five by relying on VE testimony premised upon a flawed hypothetical which failed to account for the affects of her chronic pain and other symptoms.  If Wright is correct, then the ALJ committed reversible error because substantial evidence would not support his conclusion that she was capable of working.  *See Lingenfelter v. Astrue*, 504 F3d 1028, 1041 (9th Cir 2007) (substantial evidence did not support ALJ's RFC determination where it was based on an erroneous RFC assessment); *Magallanes v. Bowen*, 881 F2d 747, 756 (9th Cir 1989) ("The [VE's] opinion about a claimant's residual functional capacity

has no evidentiary value if the assumptions in the hypothetical are not supported by the record.")
(citation omitted).

A person's RFC is the most he or she can still do despite his or her limitations.  20 CFR
§§ 404.1545(a)(1), 416.945(a)(1).  It is that individual's "*maximum* remaining ability to do
sustained work activities in an ordinary work setting on a regular and continuing basis[.]"  SSR
96-8p, 1996 WL 374184, *2; *see also* 20 CFR §§ 404.1545(b), (c), 416.945(b), (c).  "A 'regular
and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."
SSR 96-8p, 1996 WL 374184, *1.  A claimant's RFC is used to determine whether he or she has
the capacity to return to his or her past work, or, alternatively, is considered along with
vocational factors to determine whether the claimant has the ability to perform any other jobs.
20 CFR §§ 404.1545(a)(5), 416.945(a)(5).

The RFC determination is based on "all of the relevant medical and other evidence,"
including any statements about what the claimant can still do provided by medical sources,
whether based on a formal medical examination or not, and descriptions and observations of a
claimant's limitation from his or her impairments provided by the claimant or his or her family,
neighbors, and friends.  20 CFR §§ 404.1545(a)(3), 416.945(a)(3); *see also*, SSR 96-8p, 1996
WL 374184, *5.  The ALJ must "consider all allegations of physical and mental limitations or
restrictions and make every reasonable effort to ensure that the file contains sufficient evidence
to assess RFC."  SSR 96-8p, 1996 WL 3714184, *5.  An ALJ also must give "[c]areful
consideration . . . to any available information about symptoms because subjective descriptions
may indicate more severe limitations or restrictions that can be shown by objective medical
evidence alone."  *Id*.  Finally, in assessing an individual's RFC, the ALJ must consider all of a

claimant's medically determinable impairments, whether severe or not.  20 CFR

§§ 404.1545(a)(2), 416.945(a)(2).

A.    **Subjective Pain Complaints**

Wright has consistently asserted that while she would like to work, she is unable to work

because of the limitations imposed by her impairments.  Tr. 35-36, 169, 213.  With her initial

application, Wright submitted a Pain Report Questionnaire in which she reports suffering from

pain throughout her entire body.  Tr. 190-92.  She suffers headaches, neck and shoulder pain,

frequent spine spasms, uterus cramping, shooting and stabbing pain in her hips, burning pain and

swelling in her knees, stiff and aching elbows, weak ankles that pop, and burning pain in her

arms.  Tr. 190.  Some of her pain is constant; other pain occurs during flare-ups that last at least

three days.  She cannot walk for more than 20 minutes due to pain.  Standing, sitting, lifting,

stress, and her menstrual cycle all cause pain.  Medication, rest, and frequent changes in position

relieve her pain.  *Id*.

At the hearing she testified to the effects her pain has on her ability to work.  With

respect to her fibromyalgia, she testified that she can sometimes have one "good day," but then

miss several days due to "flare-ups" which leave her bed-ridden.  Tr. 35-36.  She is absent from

work, on average, four days a month due to these flare-ups, rendering her an unreliable

employee.  *Id*.  Her pain is so severe that she would "rather break my bones every day" than

experience the pain.  Tr. 36.  On a good day, she can do household chores but must take regular

breaks because her legs begin to swell after five minutes, and she is limited to a total of 30

minutes of housework.  Tr. 46.  Her pelvic floor disorder causes severe menstrual cramps which

she describes as "the worst pain I've ever felt in my entire life."  Tr. 39.  She claims her doctor

told her it is "the closest thing to giving labor a woman can go through without" giving birth. *Id*. Her pelvic pain occurs for several hours at a time and can last for several days.  Pain medicine does not take it away.  Tr. 39-40.  Also, Wright suffers from PTSD which gives her nightmares every night and makes it difficult to sleep.  Tr. 41. She hears things and is extremely paranoid around people.  *Id*.   Finally, due to her hypoglycemia, she must eat protein every two hours or can have a seizure with her most recent one occurring three weeks prior to the hearing.  Tr. 38.

If Wright's statements are taken at face value, her pain would preclude her from work on a "regular and continuing basis."  At the hearing, the VE testified that Wright could not perform competitive employment if she had to miss more than two days of work a month on a routine basis.  Tr.  56.  The ALJ rejected this limitation in concluding that Wright could work and instead adopted the RFC quoted above.  Thus he necessarily rejected Wright's testimony that her pain causes her to miss a minimum of four days of work a month.

### B.    Legal Standards

When considering a claimant's testimony that his or her pain, or other symptoms, precludes work activity, the ALJ is required to conduct a two-step analysis.  First, the ALJ must determine whether the claimant has presented substantial evidence showing that he or she has an underlying medically determinable physical or mental impairment which could reasonably be expected to produce the pain or symptoms alleged.  SSR 96-7p, 1996 WL 374186, *2 (July 2, 1996); *Batson v. Comm'r*, 359 F3d 1190, 1196 (9th Cir 2004), citing *Smolen*, 80 F3d at 1281-82.

If this first step is satisfied, the ALJ must next engage in a credibility analysis of the claimant's subjective pain testimony.  *Id*.  In doing so, the ALJ may consider all of the factors identified in the Commissioner's regulations, *see* 20 CFR §§ 404.1529(c), 416.929(c), as well as

"ordinary techniques of credibility evaluation, such as considering the claimant's reputation for truthfulness and any inconsistent statements in her testimony." *Tonapetyan v. Halter*, 242 F3d 1144, 1148 (9th Cir 2001) (citation and internal quotations omitted); *Bunnell v. Sullivan*, 947 F2d 341, 346 (9th Cir 1991) (*en banc*).  The ALJ may not, however, reject the claimant's statements concerning his or her pain or limitations merely because they are not supported by objective medical evidence.  *Fair v. Bowen*, 885 F2d 597, 602 (9th Cir 1989)

The ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Bunnell*, 947 F2d at 345-46 (*en banc*) (citation and internal quotations omitted).  Where there is no evidence of malingering, these findings must be clear and convincing.  *Batson*, 359 F3d at 1196.

C.    **ALJ's Findings**

The ALJ considered Wright's testimony concerning her pain and concluded that her "statements concerning the intensity, persistence and limiting effects of her alleged symptoms are not entirely credible."  Tr. 16.[2]  First, the ALJ found that Wright had "no associated functional limitations with a mental impairment."  *Id*.  This finding was based on "an absence of clinical findings" in the record supporting a severe mental impairment and on assessments by two examining physicians who concluded that Wright was intelligent and very knowledgeable

---

[2] The ALJ did not explicitly set forth a finding that Wright had presented substantial evidence that she had an underlying medically determinable physical or mental impairment which could reasonably be expected to produce the pain or symptoms she alleged, but this finding is implicit in his decision to consider the credibility of Wright's pain complaints.

about her condition and the medications she needed to treat them.  *Id*.  Wright has not challenged

this portion of the ALJ's findings.[3]

With respect to Wright's alleged physical limitations, the ALJ's conclusions were not

enumerated with specificity.  Instead, he simply recounted his reading of the medical evidence

and was "persuaded that she has some functional limitations associated with a mild cervical

degenerative disc disease and fibromyalgia, but certainly the full record does not remotely

support that she is unable to sustain regular work activity."  Tr. 19.  The Commissioner discerns

four justifications the ALJ gave for rejecting Wright's pain testimony:  (1) the amount (or lack)

of treatment Wright required; (2) the lack of  reports by any treating physician substantiating the

level of pain Wright felt; (3) contradictions with her allegations and statements made to treating

sources; and (4) a work release issued by independent medical examiner ("IME") who evaluated

Wright in the context of her worker's compensation claim.  This court concludes that none of

these reasons is supported by substantial evidence.

###   D.    Analysis

####     1.    Amount of Treatment

The amount of treatment a claimant receives is "an important indicator of the intensity

and persistence of [a claimant's] symptoms."  20 CFR §§ 404.1529(c)(3), 416.929(c)(3).  When

a "claimant complains about disabling pain but fails to seek treatment, or fails to follow

prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the

complaint unjustified or exaggerated."  *Orn*, 495 F3d at 638, citing *Fair*, 885 F2d at 603.

---

[3]  In a letter to the Appeals Counsel contesting the ALJ's decision, Wright makes it clear that she does not agree with the ALJ's findings about her mental impairments, but has presented no arguments to this court about what errors the ALJ made or what evidence undermines his conclusion.  See Tr. 216-20.

Addressing Wright's complaints of unpredictable pain flare-ups, including pain in her knees, ankles, hips, and pelvic pain, the ALJ concluded that "treatment records do not suggest more than intermittent required treatment." Tr. 19. This conclusion is at odds with the substantial evidence in the record and fails to take into account significant evidence in the record concerning Wright's unique circumstances.

Despite periods in which she was homelessness or lacked insurance, Wright sought treatment for her pain complaints continuously. Related to her complaints of pelvic pain, in September 2005, Wright sought care from her treating gynecologist, Dr. Murphy, for heavy, painful menstruation. She had been suffering from similar symptoms for some time (Tr. 345, 401, 542-52, 565-74) and was seeking "a definitive diagnosis and therapy." Tr. 347. After being diagnosed with pelvic floor dysfunction, Wright continued to seek treatment for abdominal and pelvic pain with Dr. Murphy through early 2006. Tr. 352. Dr. Murphy noted that her pelvic floor dysfunction required physical therapy for treatment, but surmised that because "she has lost her insurance at this point [she] most likely will not obtain physical therapy." Tr. 348; *see also* Tr. 303 (reporting loss of insurance in February 2005). Accordingly, he continued treating her with a regimen of painkillers and antidepressants through March 2006 when she moved back to Eugene. *Id*; Tr. 349-51.

After returning to Eugene, Wright began treatment at the White Bird Clinic, complaining of a fibromyalgia flare-up causing a stiffening in her right arm and hand which was keeping her awake at night. Tr. 298. Dr. Newhall informed Wright that the clinic did not have the resources to treat fibromyalgia. *Id*. Wright did receive some treatment for fibromyalgia through the Volunteers in Medicine Clinic, where she was prescribed Ibuprofen, Ultram, Trazadione,

Effexor, and Flexeril for pain and psychological issues. Tr. 280. These records end in January

2007 when Wright became ineligible for treatment at this clinic because she had no income.

Tr. 166. At that point, she was without any avenue for treatment of her fibromyalgia.

Wright also sought treatment for other pain complaints, including for neck and shoulder

pain secondary to an on-the-job injury (Tr. 332-35), pain in her knees and legs (Tr. 330, 382-86,

380-81, 295), pain in her arms, (Tr. 298, 650) and pain in her lower back (Tr. 280-81, 295, 654,

650). Much of this care, as well as the care for her pelvic pain and fibromyalgia, was sought in

emergency rooms and urgent care clinics, or, for her neck and shoulder pain only, in the context

of a worker's compensation claim. Tr. 431, 421-30, 390-400, 263-65, 258-62, 296,  645-47, 652,

664-67. Since she visited an emergency room or urgent care clinic at least 36 times during the

period under review, this treatment record cannot be reasonably described as "intermittent."

Even if the amount of treatment she sought for her pain was not sufficiently frequent to

allay the ALJ's suspicion that her pain complaints were exaggerated, the ALJ failed to consider

the impact of Wright's indengency on her ability to seek out and receive medical care. Her

failure to seek out treatment more frequently during a period in which she was uninsured is not a

legitimate basis for finding she lacks credibility. *See Orn*, 495 F3d at 638 (finding that a

claimant's "failure to receive medical treatment during the period that he had no medical

insurance cannot support an adverse credibility finding"). According to the Commissioner's

ruling on the subject:

> the adjudicator must not draw any inferences about an individual's
> symptoms and their functional effects from a failure to seek or pursue
> regular medical treatment without first considering any explanations that
> the individual may provide, or other information in the case record, that
> may explain infrequent or irregular medical visits or failure to seek
> medical treatment.

SSR 96-7p, 1996 WL 374186, *7.

Despite the fact that Wright was uninsured and unemployed for much of the period under review, she still managed to amass a voluminous medical record reflecting her attempts to receive relief for her pain.  As noted by Dr. Murphy and as demonstrated by her loss of access to treatment through the Volunteers in Medicine Clinic, Wright's indigence and lack of insurance played a role in the amount and type of treatment she was able to obtain.  It appears that due to these factors, Wright was at times unable to seek out treatment for her pain aside from attending free or low-cost medical clinics, when available, and going to the emergency room when her pain became especially acute.  Thus, even if the frequency of Wright's treatment could be considered insufficient to corroborate her pain testimony, she has legitimate reasons for that frequency which the ALJ failed to address.  The ALJ erred by finding Wright's complaints lacked credibility due to her failure to seek out more than intermittent treatment without exploring the impact of her lack of insurance and periodic homelessness on her ability to pursue that treatment.  Moreover, because her treatment was not intermittent, this factor does not weigh against Wright's credibility.

**2.        Lack of Substantiation by Treating Physician**

The Commissioner also defends the ALJ's credibility determination on the basis that no treating physician reports substantiated the intensity level she described.  This is nothing more than a repackaged argument that the degree of pain Wright experienced is not supported by objective medical evidence, which cannot alone be a basis for rejecting Wright's testimony. *Fair*, 885 F2d at 601-02.

As discussed above, Dr. Murphy treated Wright for just over a year and noted her severe pain complaints with respect to her pelvic floor dysfunction on numerous occasions. Tr. 345, 347-49, 469-71. At many of these appointments he performed pelvic exams which revealed noticeable discomfort. For example, on September 9, 2005, Dr. Murphy examined Wright and observed uterine and ovarian discomfort, noting that she cried during the examination. Tr. 347. Several days later he noted that Wright had lost 13 pounds in the past six months secondary to nausea and vomiting from her pain. Tr. 469.

From late 2006 through the end of the medical record, Wright received treatment from Dr. Newhall to whom Wright reported several flare-ups of her fibromyalgia which caused her severe pain in her hand, back, legs, and abdomen. Tr. 298, 296, 294, 653. On one occasion she reported her pain was so bad that it caused her to vomit. Tr. 296. Dr. Newhall treated her pain primarily by prescribing pain killers and antidepressants. Tr. 167.

As the ALJ noted, diagnostic tests performed on Wright failed to reveal physiological abnormalities or possible etiologies which would explain her frequent pain. *See* Tr. 447, 469-70, 533-64, 401, 664-67. But the record shows that on numerous occasions, treating and examining physicians recorded Wright's pain as being "acute," "chronic," "severe," "excruciating," "intractable," or "incapacitating." Tr. 349, 351, 469, 472, 629, 647, 650, 676. Far from disbelieving her reports, her treating physicians treated her with medications to relieve her symptoms.

The ALJ erred in relying on the lack of any treating physician that substantiated the level of her reported pain. Thus, this factor does not weigh against her credibility.

### 3.    Contradictions

An ALJ may find a claimant not credible based upon inconsistent statements in the record. *Tonapetyan*, 242 F3d at 1148.  The ALJ noted that on several occasions, Wright reported to treatment providers that her various complaints were not bothering her.  For example, in December 2004, a year before her alleged date of onset, Wright reported she was "currently not suffering from Fibromyalgia."  Tr. 313.  In May of 2006, Wright reported suffering from abdominal pain but denied any musculoskeletal complaints. Tr. 645-46.  In September 2006, Wright reported that her fibromyalgia was being helped with medication.  Tr. 282-83.  At that same appointment, Wright declined an examination of her knees where she had previously reported pain because they were "normal now."  *Id*.

The Commissioner contends that these reports demonstrate that Wright had received "successful prescribed treatment" for her fibromyalgia and other pain complaints.  However, this conclusion ignores the substantial weight of the record which supports Wright's contention that she has good days and bad days.  On bad days, she is in disabling pain that leaves her bed-ridden.  Nothing in the record contradicts her statements concerning the frequency, nature, or severity of her pain as a result.  The fact that, on occasion, she felt fine in one area where she previously had reported pain, or that she was not experiencing symptoms at a particular time, does not contradict, but rather supports, her statements concerning her pain.

Also, Wright made complaints of severe fibromyalgia flare-ups, abdominal and cervical pain, and leg pain after instances relied on by the ALJ.  *See* Tr. 295 (February 2007: knee and back pain and fibromyalgia), Tr. 654 (April 2007: fibromyalgia flare-up and bed-ridden due to back pain), Tr. 645-47 (May 2007:  acute pelvic pain), Tr. 650 (July 2007:  back pain and numbness, swelling of her hands); Tr. 664-67 (October 2007:  acute pelvic and abdominal pain).

21 - FINDINGS AND RECOMMENDATION

Thus, there is no basis in the record for concluding that these pain complaints had fully resolved in 2004 or by 2006.

The ALJ failed to appreciate the nature of Wright's fibromyalgia and chronic pelvic pain. The ALJ discounted and minimized her pelvic floor dysfunction and minimized the symptoms she reported as a result of her fibromyalgia. While being willing to accept her diagnosis, the ALJ was unwilling to accept the associated symptoms as being legitimate manifestations of her disease. Instead, he selectively cited to those instances in the record where a particular pain complaint, reported either previously or subsequently to the instance selected, was not present.

The record does not support the conclusion that Wright has contradicted herself on her pain complaints. Rather, she has been consistent in her reports of frequent, unpredictable, severe pain in her abdominal and pelvic regions, back, legs, arms, neck and shoulders. This factor does not undermine her credibility.

### 4.    Worker's Compensation Work Release

Finally, the Commissioner relies on a portion of the ALJ's opinion where the ALJ noted that after conducting an IME, Stephen W. Teal, MD, an orthopedic surgeon, released Wright back to work as a caregiver for the elderly and infirm. Tr. 18, 626-36. Dr. Teal evaluated Wright in October 2006 in the context of her worker's compensation claim filed after an on-the-job injury she received in July 2005. The ALJ did not discuss, however, the fact that Dr. Teal evaluated Wright for the progress of her on-the-job injury and not for the impact of her fibromyalgia and pelvic floor dysfunction. As a result, his opinion is of little relevance to what limitations may be imposed by these conditions.

Also, while Dr. Teal noted that Wright had obtained another job upon returning to Eugene in 2006 but had been dismissed prior to the probationary period, he did not discuss the reasons for that dismissal.  Wright has explained that she was let go from her job because she had accumulated too many sick days and days when she left early due to sickness and pain and swelling in her legs.  Tr. 213, 124, 143.  She held two other brief positions in the same field around the same time with the same result.  Tr. 125, 143-44.  This demonstrates that despite the fact that Wright's on-the-job injury may possibly have been resolved (and another IME in the record reached the opposite conclusion (Tr. 406-19)), her pain actually does interfere with her ability to maintain work on a regular and continuing basis.

Moreover, these unsuccessful work attempts contradict the ALJ's statement that the "full record does not remotely support that she is unable to sustain regular work activity."  Tr. 19. Rather, the record shows that even when Wright attempted to work, she was unable to continue due to limitations imposed by her pain and other conditions.  This also is not a clear and convincing reason for finding her to lack credibility.

### 5.    Activities of Daily Living

The ALJ's final reason for rejecting Wright's subjective pain testimony was that her activities of daily living betrayed a greater level of functioning.  Although neither the Commissioner nor Wright address this factor, this court has an obligation to evaluate all the evidence in the record.  *Martinez*, 807 F2d at 772.

According to Wright, she can only be active one to two hours before needing to rest with nonstrenuous activity or 15 to 20 minutes with strenuous activity.  Tr. 191.  She has to take breaks in order to complete chores.  *Id*.  She needs to sit on a stool while taking a shower.

Tr. 192.  She needs some help with household chores that require lifting.  *Id*.  On a good day she can engage in a hobby for 30 minutes, but not on a bad day due to an inability to concentrate. *Id*.  She eats prepared or canned foods or friends cook for her. *Id*.  She sleeps well for the most part though sometimes pain keeps her up.  Tr. 137.  She must rest during the day and does so at her sister's house or at a shelter.  *Id*.  She has problems with concentration and memory and becomes easily overwhelmed and needs breaks.  Tr. 140.

Wright's sister completed a function report form and testified at the hearing.  Tr. 49-51, 171-78.  Wright lives at her sister's or grandmother's house.  Tr. 171.  Her daily activities can include eating, taking a shower, reading, cleaning, going to appointments, watching television, and looking for employment.  *Id*.  She is able to care for her dog.  Tr. 172.  She either has trouble sleeping or sleeps too much.  *Id*.  She prepares food but only whatever is fast and easy.  Tr. 173. She does chores if she feels up to it but not yard work which is too physical.  *Id*.  She is able to get herself to her appointments and the grocery store, though she does not have a license. Tr. 174.  Her hobbies include reading, watching television or movies, and playing board games.  Tr. 175.  Her social activities include talking on the phone and watching movies with her sister, going to church as often as possible, though not as often any more.  Tr. 175-76.  Wright's impairments affect her physical abilities, but her sister did not know the specifics. Tr. 176.   She does not believe Wright can hold a full-time job because she is sick all the time.  Tr. 50.

Wright's grandmother also completed a function report which paints a similar picture of Wright's abilities.  Tr. 179-86.  Wright has to sit on a stool to shower.  Tr. 180.  While she prepares her own meals, she uses only fast, prepackaged food.  Tr. 181.   When staying with her grandmother, Wright is usually sick in bed.  *Id*.  She is a clean person but needs help keeping

things up daily.  *Id*.  Her interests include reading, watching television, and doing crosswords.

Tr. 183.  Wright used to enjoy cooking, riding a bike, and volunteering but can no longer do these

activities.  *Id*.  She is unable to take part in many social activities due to pain and fatigue.  Tr.

184.  Physical activities such as lifting, squatting, bending, standing, reaching, and walking

increase her pain which then causes fatigue and affect her memory and concentration.  *Id*.

The ALJ assigned partial credibility to the statements of Wright's sister and grandmother,

but noted that neither of them could provide specifics about how her condition affected her

functional abilities.  Tr. 19-20.  He concluded that Wright's daily activities were "not

inconsistent" with the RFC he adopted.  Tr. 20.

However, Wright has never claimed that she is unable to do any activities.  Rather, she

reports that she has frequent and severe flare-ups of pain that cause her to be an unreliable

employee due to her need to leave early or take sick days.  Her own statements about her daily

activities are consistent with this testimony and are confirmed by both her sister and grandmother,

"the two people closest to" her  and who "see her regularly."  Tr. 189.  Wright's daily activities

do not show that she is "capable of consistently working an 8-hour day in the competitive world

of an unsheltered workplace, nor are [her] . . . activities inconsistent with [her] description of her

limitations."  *Ratto v. Sec'y, Dept. of Health and Human Servs.*, 839 F Supp 1415, 1428 (D Or

1993); *see also Fair*, 885 F2d at 603 ("The Social Security Act does not require that claimants be

utterly incapacitated to be eligible for benefits, and many home activities are not easily

transferable to what may be the more grueling environment of the workplace, where it might be

impossible to periodically rest or take medication." (internal citations omitted)).  These third-

party statements are not consistent with the ALJ's RFC because they do not support his implicit

assumption that Wright is capable of working eight hours a day, five days a week, or his

conclusion that she would not miss more than two days of work a month.

### E.   Conclusion

The ALJ also failed to appreciate the nature and effect of Wright's chronic pain and the

limiting effect it would have on her ability work.  The evidence of that effect is particularly strong

since Wright failed at three successive jobs after her alleged date of onset due to her pain and

other symptoms.  Because the ALJ improperly rejected Wright's statements concerning the

limiting effects of her pain, he failed to include a proper analysis of her limitations in his RFC.

As a result, the testimony of the VE which the ALJ accepted was not supported by substantial

evidence.  Accordingly, the Commissioner's decision, adopting the ALJ's conclusions, should be

reversed.

## IV.   Remand

Having concluded the Commissioner's decision should be reversed, the next issue is

whether to remand for an immediate award of benefits or for further proceedings.  This decision is

within the court's discretion.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US

1038 (2000).

A remand for an award of benefits is appropriate when no useful purpose would be served

by further administrative proceedings because the record has been fully developed and the

evidence is not sufficient to support the Commissioner's decision, and it is clear from the record

that the ALJ would be required to award benefits.  *Benecke v. Barnhart*, 379 F3d 587, 593 (9th Cir

2004); *Holohan v. Massanari*, 246 F3d 1195, 1210 (9th Cir 2001); *Rodriguez v. Bowen*, 876 F2d

759, 763 (9th Cir 1989).  Improperly rejected evidence should be credited as true and an

immediate award of benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Harman*, 211 F3d at 1178, citing *Smolen*, 80 F3d at 1292.  If it is not clear that the ALJ would be required to award benefits were the improperly rejected evidence credited, then the court has discretion whether to credit the evidence.  *Connett v. Barnhart,* 340 F3d 871, 876 (9th Cir 2003).

As the VE testified at Wright's hearing, if Wright's pain caused her to miss more than two days a month at a full time job, she would be precluded from all competitive employment. Wright testified that she misses work at least four days a month.  Her testimony is corroborated by the fact that during the period under review, she made at least three attempts at holding a job, but was unable to retain her employment due to the pain inflicted by her conditions.  Her testimony is also supported amply by the medical record which demonstrates she suffers from disabling pain caused by fibromyalgia and a pelvic floor disorder.  Credited as true, her testimony shows that she is unable to maintain gainful employment.  Accordingly, this case should be reversed and remanded for an immediate calculation and award of benefits.

///

///

**RECOMMENDATION**

The decision of the Commissioner should be REVERSED and this case should be REMANDED for an immediate calculation and award of benefits.

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due August 17, 2009.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 31st day of July, 2009.

s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

28 - FINDINGS AND RECOMMENDATION